1
2
3
4
5

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kelly L. Hall, et al., | Case No.  1:13-cv-01711-SKO |
| Plaintiffs, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | (Doc. 32) |
| FEDEX FREIGHT, INC., an Arkansas Corporation, and DOES 1 through 25, inclusive. | |
| Defendants. | |
| _____/ | |

## I.   INTRODUCTION

On November 3, 2014, Defendant FedEx Freight, Inc. ("FedEx") filed a motion for summary judgment.  Plaintiffs Richard Arp ("Arp"), Israel Flores ("Flores"), and Roy Taylor ("Taylor") (collectively "Plaintiffs")[1] filed an opposition brief, and FedEx filed a reply brief.  For the reasons set forth below, FedEx's motion for summary judgment is GRANTED.

## II.   BACKGROUND

**A.   FedEx's Statement of Facts**

**1.   FedEx Operations**

FedEx employs "Road Drivers" to transport freight using tractor-trailers between various company facilities called service centers.  (Doc. 34-2, Defendant's Statement of Undisputed

---

[1] The claims of Plaintiffs Kelly Hall, Robert Markowitz, and Richard Rodriquez were dismissed as time barred on July 11, 2014.  (Doc. 25.)

Material Facts ("DUMF") 1.)[2]  A Road Driver's trip is generally referred to as a "run."  (DUMF 2.) FedEx pays Road Drivers by a mileage-based piece rate for the run or trip, and they also earn an hourly rate or other fixed pay amounts when they perform work other than driving, such as attending a meeting or working on a service center dock loading trailers.  (DUMF 3.)

At FedEx seniority is significant, and FedEx uses two different kinds of seniority markers: (1) Company Seniority which is the date the employee started at the company, and (2) Job Class Seniority which is the date the employee starts working in his or her particular job position. (DUMF 4.)  The seniority system was not changed in the time relevant to this lawsuit.  (DUMF 5.)

FedEx assigns runs to Road Drivers within each service center using a seniority-based bidding process.  (DUMF 6)  Approximately two times a year, each service center conducts a "bid" during which the Road Drivers, in order of Job Class Seniority, are eligible to select their runs.  (DUMF 7.)  When the drivers bid, they can either select a designated run or they can choose to select an "Extra Board."  (DUMF 8.)  The Extra Board refers to those drivers who do not have a set run but instead drive to wherever the needs of the day may take them.  (DUMF 9.)  In general, because Road Drivers are paid based on their mileage, the longer the run, the more the Road Driver is eligible to earn for a particular trip.  (DUMF 10.)

According to FedEx, the freight business is unpredictable and can change based on shipper needs and the time of year.  Thus, it is impossible to be certain whether a particular run will remain assigned to the same service center for an extended period of time, or to the same driver (DUMF 15), or to determine with any certainty whether FedEx will continue to assign a particular driving run to the same service center for an extended period of time (DUMF 16).

FedEx maintains that, to meet these changing needs, it must periodically add or drop driving runs, and it opens and closes service centers.  (DUMF.)  FedEx also frequently engages in what it calls a "change of operations," which involves moving certain driving runs from one service center to another to better the service to FedEx customers and to streamline the movement of freight.  (DUMF 19.)  When a change of operations occurs, FedEx will often need more Road Drivers assigned to the service centers where the freight is being re-routed, so Road Drivers from

---

[2] The parties were unable to complete a joint statement of undisputed facts and submitted individual statements.

the current facilities are required to "follow-the-freight" to those different service centers.  This is called an involuntary transfer.  (DUMF 20.)  In contrast, an employee's request to transfer to an open position at another service center of his own volition is termed a "voluntary transfer." (DUMF 21.)

FedEx maintains internal written policies to ensure that it treats employees fairly and consistently.  (DUMF 22.)  Under its policies, Road Drivers who agree to a company offer to transfer involuntarily are treated better in regard to seniority at the new facility than those who voluntarily moved there.[3]  If the transfer is voluntary, the Road Driver's Job Class Seniority date changes to the date of the employee's transfer.  (DUMF 22.)  When the transfer is involuntary, the employee retains his or her Job Class Seniority.  (DUMF 24.)

### 2. Changes of Operation

As part of a 2008 change of operations, FedEx opened a service center in Fresno, California, and a relay yard (lot where drivers from different locations meet to exchange trailers) 55 miles away from Fresno in Kettlemen City ("KC").  (DUMF 27.)  Forecasting that it might want to transport more freight along that corridor in the future, FedEx began planning a service center for KC.  (DUMF 28.)  According to FedEx, it was not clear exactly when the new service center in KC would open or how much freight would move through it when it was opened. (DUMF 29.)

In spring 2012, FedEx announced another change of operations that affected how it moved freight along the Interstate 40 corridor (running across the southern U.S., from Wilmington, North Carolina, to Barstow, California) (the "I-40 change of operations").  As a result of this change, FedEx needed additional Road Drivers at the KC relay yard.  (DUMF 31.)  Like prior changes of operations, some drivers who came to the KC relay yard followed-the-freight (also referred to as "following-the-work") from their prior work locations and retained their Job Class Seniority, while others voluntarily transferred to KC without retaining their Job Class Seniority.  When FedEx announced the I-40 change of operations, it posted the new job opportunities to its internal bulletin

---

[3] An employee may accept the involuntary transfer as an alternative to being laid off, retiring, or voluntarily transferring to another service center, apparently.

1  system.  Kirk Sell ("Sell"), the service center manager of the Fresno facility who was temporarily

2  covering the KC relay yard, fielded calls from drivers interested in the move and estimates he

3  spoke with 25 to 40 drivers.  (DUMF 35.)  Plaintiffs Taylor, Arp, and Flores were among those

4  interested in the position.  (DUMF 36.)

5          Taylor and Flores contacted Sell to get more information, and Arp and Taylor also spoke

6  with the Medford service center manager, Irene Stonecipher.  (DUMF 64, 65, 93.)  Taylor claims

7  that Sell provided him with an estimate of the run he might receive based on his anticipated Job

8  Class Seniority date after the transfer.  (DUMF 66.)  Sell also told Taylor and the other drivers that

9  they would be getting in on the "ground floor."  (DUMF 67.)  Sell told Flores that there would be

10 "good runs" available in KC.  (DUMF 94.)

11         Each Plaintiff applied for a voluntary transfer to KC, and in June 2012 each Plaintiff

12 received a written offer from FedEx for a Road Driver position at KC.  The written letter to each

13 Plaintiff stated that (1) the transfer was "employee requested"; (2) his "job class seniority will

14 change" to the date of the transfer; and (3) his "company seniority date will remain unchanged."

15 (DUMF 39.)  The letter also outlined the pay rates for the new position.  (DUMF 42.)

16         Plaintiffs transferred to KC within the first two weeks of July 2012 (DUMF 43), and were

17 assigned a run by Sell in order of seniority (DUMF 47).  In late July 2012, FedEx appointed a new

18 service center manager, Armando Magana ("Magana"), to run the KC center.   (DUMF 49.)

19 Several members of management, including Sell and John Hinckley ("Hinckley"), held a driver

20 meeting to introduce Magana to the drivers.  (DUMF 40.)  Hinckley discussed the opening of the

21 new service center at KC, now delayed from September to November 2012 (and later delayed until

22 January 2013).  (DUMF 51.)  Hinckley informed the drivers that 30 to 40 additional drivers would

23 transfer to KC as a result of a change of operations, and those drivers would retain their Job Class

24 Seniority.  (DUMF 52.)  According to Hinckley, the existing KC drivers did not raise "concern or

25 discontent" during this or any other meeting held in the fall of 2012.

26         In November 2012, a change of operations that would shift driving runs from the Fresno

27 service center to the KC service center – set to be fully-constructed by January 2013 – was

28 announced ("Fresno change of operations").  (DUMF 53.)  In December 2012, FedEx posted a

1 listing of the Job Class Seniority rankings for each Road Driver.  (DUMF 54.)  The list identified

2 for the first time those Road Drivers who had agreed, following the November announcement, to

3 involuntarily transfer from the Fresno service center to the KC service center when it expanded.

4 (DUMF 54.)  Taylor and Flores reported they were upset by their current rankings on the seniority

5 list because the Fresno Road Drivers would retain their existing Job Class Seniority.  (DUMF 76,

6 105.)  Following a meeting between FedEx and the KC drivers at the service center in late

7 December 2012, FedEx considered the matter resolved.  (DUMF 58.)

8      In January 2013, the KC service center opened, and 33 drivers moved from Fresno to the

9 new facility.  (DUMF 59.)  Based on a bid that included the newly-transferred drivers, Taylor and

10 Flores each received new driving assignments.  (DUMF 77.)

11 **B.      Plaintiffs' Statement of Facts[4]**

12      According to Plaintiffs, FedEx employs both city and line-haul drivers to deliver freight.

13 The city drivers generally deliver freight directly to FedEx customers, within a particular city,

14 while line-haul drivers move large quantities of freight between cities.  Line-haul drivers are paid

15 by the mile, and they also earn an hourly rate for other non-driving work.  The single most

16 important factor in determining how much a line-haul driver earns is the length of his route or

17 "run."  The longer the run, the more a line-haul driver earns.

18      Because of the vast disparity in earning potential between the various runs, there is fierce

19 competition among the drivers for the longer, more profitable runs.  To alleviate this competition,

20 FedEx created a seniority-based system for assigning drivers to the various runs.  Thus, there are

21 two seniority dates:  (1) the company seniority – the date the driver started working for FedEx –

22 that determines vacation days and the order in which a driver will be laid off if FedEx has to

23 reduce its workforce; and (2) job class seniority – the date a driver began working line-haul at a

24 particular service center.  When bidding occurs at a service center, a list of available runs to

25 various locations is published.  The driver with the highest job class seniority gets his or her

26

27

[4] Plaintiffs' statement of facts is taken from their opposition brief; many of these facts are disputed by the parties.
28 (Doc. 33.)

5

1 | choice of any run on the list, the driver with the second highest job class seniority gets the next
2 | choice.

3 |      In most FedEx service centers, there are more line-haul drivers than there are regular runs
4 | because circumstances can change and extra runs may need to be added to the schedule for a
5 | variety of reasons including that regular drivers take vacations and occasionally call in sick.  The
6 | excess drivers are placed on the "extra board" and are on-call in the event a run needs to be added
7 | to the schedule such as when regular drivers take vacations and occasionally call in sick.  These
8 | are the most junior drivers in terms of job class seniority, and they often pick up extra shifts on the
9 | weekends and evenings working on the docks or as "hostlers."  According to Plaintiffs, it is very
10 | undesirable to be on the "extra board" because a driver is on-call, often seven days a week, and the
11 | driver does not know if he is going to work and, if so, how much.

12 |      A driver's Job Class Seniority is of paramount importance because it determines whether a
13 | driver will receive a regular profitable run or whether the driver will be on-call and pick up
14 | whatever is available on an as-needed basis.  The vast majority of runs remain consistent from
15 | year to year; however, on occasion a new run will need to be added, or an old run will need to be
16 | cut.  These fluctuations do not affect senior drivers because they always have first choice of the
17 | most profitable runs; the junior drivers on the Extra Board, however, are highly affected by these
18 | fluctuations because when runs are cut, these drivers may receive no work.

19 |      Because job class seniority is determined by the date a driver began to work at a particular
20 | service center, if a senior driver elects to transfer to another service center, his job class seniority
21 | is reset to the date of the transfer, and he is placed at the bottom of the seniority list.  In the event
22 | of a change of operations, however, FedEx gives the drivers at the affected service center an
23 | opportunity to follow the work and transfer to the service center where the freight is being re-
24 | routed while keeping their job class seniority.  According to Plaintiffs, this generally does not
25 | significantly affect the drivers at the service center where the freight is being re-routed because
26 | any driver transferring under a change of operations brings a run with them when they transfer.

27 |      Plaintiffs claim the Fresno change of operations they experienced while working at KC
28 | was very unusual.  As early as 2008, FedEx began the planning process of opening a service

center in KC.  In opening this service center, FedEx solicited drivers from other service centers – including Plaintiffs – to transfer under the guise that it was a new service center where they would be slotted with a high seniority.  Instead, KC was actually scheduled and planned as part of moving the Fresno service center drivers and routes to KC.  As a result, Plaintiffs were not getting in "on the ground floor of a new service center" as represented by FedEx management, but were actually transferring long distances to KC to be on the Extra Board.

In 2010 Sell began informing the drivers in Fresno about the upcoming Fresno change of operations and that Fresno drivers would be permitted to transfer to KC involuntarily and keep their seniority.  Fresno drivers were specifically told by Sell to wait until January 2013 before moving to KC so that they could keep their seniority under the change of operations.

Prior to the Fresno change of operations in January 2013, the KC relay station – not yet a service center – needed 17 drivers.  Sell, as service center manager of both Fresno and KC, was placed in charge of staffing the KC relay station.  In early 2012, as part of these responsibilities, Sell posted openings on the FedEx internal bulletin board requesting that interested drivers apply for positions in KC.  Plaintiffs saw the postings and sought information from FedEx management about the openings at KC.

Plaintiffs contacted management, including Sell, about the positions and were told they were "getting in on the ground floor of a new service center."  On an initial list of approximately 24 drivers – expanding to 60 drivers in the future – Plaintiffs were each told they would be between number 11 and 17 in terms of seniority.  Plaintiffs knew that as the KC service center expanded, they would move up in terms of seniority because most drivers that transferred after them would have to reset their seniority as of the date they were hired or transferred.

However, in January 2013, all of the Fresno drivers moved to KC and kept their seniority as planned and anticipated by FedEx under the Fresno change of operations.  FedEx transferred 33 drivers from Fresno, but only 25 runs.  FedEx policy would normally dictate that 8 of those drivers lose their seniority because they did not follow the work, but Sell, contrary to FedEx policy, allowed all of his Fresno drivers to keep their seniority as this was what he had told them he was going to do for months.  Before the Fresno change of operations in January 2013, all the drivers in

1    KC had a regular run – there was no Extra Board and no one was on-call.  When drivers from

2    Fresno transferred, they took Plaintiffs' positions, and Plaintiffs were moved to a newly-created

3    Extra Board.

4         According to Plaintiffs, Sell intentionally withheld the important long-term plans for the

5    KC service center to mislead and deceive Plaintiffs into transferring to very undesirable positions.

6    Plaintiffs maintain that Sell was openly telling Fresno drivers about the Fresno change of

7    operations as early as 2010 but did not so inform Plaintiffs when they inquired about transferring

8    in 2012.  Plaintiffs assert Sell knew that if he told Plaintiffs about the Fresno change of operations,

9    they would not transfer.  Plaintiffs contend they all had considerable seniority at their service

10   centers before transferring to KC, and none of them would have considered leaving their positions

11   to be on an Extra Board in KC.

12        Plaintiffs claim that as a result of the deception, Plaintiff Arp had no choice but to resign

13   from FedEx and move back to Oregon; Plaintiffs Taylor and Flores stayed in KC, but had to work

14   six and seven days per week to earn the same amount they were earning before the transfer.

### III.    LEGAL STANDARD

16        Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and

17   any affidavits provided establish that "there is no genuine dispute as to any material fact and the

18   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one

19   that may affect the outcome of the case under the applicable law.  *See Anderson v. Liberty Lobby,*

20   *Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury

21   could return a verdict in favor of the nonmoving party."  *Id.* (internal quotation marks and citation

22   omitted).

23        The party seeking summary judgment "always bears the initial responsibility of informing

24   the district court of the basis for its motion, and identifying those portions of the pleadings,

25   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

26   which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

27   *Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this

28   responsibility, however, varies depending on whether the issue on which summary judgment is

sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the nomoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

# IV.    DISCUSSION[5]

## A.    The Parties' Arguments

### 1.    FedEx's Motion for Summary Judgment

FedEx asserts it is entitled to judgment with respect to Plaintiffs' fraud claim for a variety of reasons, including that (1) Plaintiffs cannot establish any FedEx representation was false; (2) even if any FedEx representations were false, the statements are too vague to enforce; and (3) Plaintiffs cannot establish the requisite intent.

FedEx presents 5 alternative arguments including that (1) any alleged statements made to Plaintiffs are privileged pursuant to California Civil Code § 47(c)(3) and not actionable; (2) Plaintiffs cannot establish actual reliance because they continued to work at FedEx after learning the "true" facts of their positions; (3) Plaintiffs' reliance was not justifiable or reasonable under the circumstances; (4)  Plaintiffs did not suffer any damages as a result of the alleged false statements; and (5) FedEx's initial performance negates any claim of fraud.

Regarding Plaintiffs' claims for breach of oral contract and breach of an implied-in-fact contract, FedEx asserts that Plaintiffs are at-will employees and as such they cannot establish the terms of a contrary contract as a matter of law.  FedEx asserts 3 alternative arguments: (1) even if there is an agreement, its terms are unenforceable because they are too vague and indefinite; (2) Plaintiffs cannot establish the element of breach – everything Plaintiffs allege they were told came true; and (3) Plaintiffs have not suffered any damages – they made more money upon their transfer to KC.[6]

---

[5] The parties each made objections, which the Court has carefully reviewed.  To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on admissible evidence and, therefore, the objection is OVERRULED.  It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted.  This is particularly true when the evidentiary objections consist of general objections such as "irrelevant" or "vague."  *See Capital Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010).

[6] FedEx also presented argument regarding Plaintiffs' claims for constructive fraud and breach of the covenant of good faith and fair dealing, but Plaintiffs stated in their opposition they did not oppose judgment regarding these claims.  (Doc. 33, 11:14-18.)  Thus, FedEx's arguments as to those claims are not addressed.

1          **2.      Plaintiffs' Opposition**

2               **a.      Fraud Claim**

3          Plaintiffs concede the promises made to them by FedEx management were generally true

4    when they first arrived in KC, but that FedEx characterizes their fraud claims too narrowly as

5    related only to affirmative untruthful statements rather than concealment of the Fresno change of

6    operations.   Plaintiffs maintain their reliance on management's statements (or the lack thereof) is a

7    question of fact for the jury.

8          Regarding their damages, Plaintiff Arp was forced to resign, move back to Oregon, and

9    now makes roughly half of what he earned before the transfer; Plaintiff Taylor had to work six or

10   seven days a week to earn the same amount of money he used to earn in five days of work; and

11   Plaintiff Flores moved his wife and children to a new city and now has to work six days a week to

12   make less than he made in the year prior to his transfer.  Further, Plaintiffs may recover the costs

13   associated with uprooting their families and the expenses incurred in relocation and the loss of

14   security and income.

15         Plaintiffs argue FedEx's deceptive representations are not privileged under California Civil

16   Code § 47(c).  Plaintiffs contend Section 47(c) does not apply to actions between an employer and

17   an employee regarding their communications with each other – the section creates a privilege

18   barring third-party suits alleging harm by communications between an employer and an employee.

19               **b.      Contract Claims**

20         Plaintiffs argue that FedEx has long-standing rules regarding seniority, transfers, and the

21   selection of runs that are contained in the employee handbook and were communicated verbally to

22   the employees by management.  FedEx breached these oral and implied-in-fact agreements when

23   they transferred drivers from Fresno to KC with fewer runs than drivers.  Had FedEx adhered to

24   the policy, Plaintiffs would still have their runs, there would be no Extra Board, and Plaintiffs

25   would not have been harmed to the extent they were harmed.   There are questions of fact

26   regarding whether these policies, oral and written, establish a contract and whether FedEx violated

27   that contract.

28

**B.      FedEx is Entitled to Summary Judgment as to Plaintiffs' Fraud Claims**

Under California law, the elements of fraud include the following:  (1) misrepresentation – i.e., false representation, concealment, or nondisclosure; (2) knowledge of falsity, or scienter; (3) intent to defraud – i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Engalla v. Permanente Medical Grp., Inc.*, 15 Cal. 4th 951, 974 (1997).

> **1.      False Representation Based on Affirmative Statements**
>
> > **a.      The Truth of FedEx's Alleged Misrepresentations Vitiates Plaintiffs'**
> > **Fraud Claims Based on Affirmative Misrepresentations**

FedEx argues it is entitled to judgment on Plaintiffs' fraud claim because Plaintiffs concede the promises FedEx allegedly made were true at the time they were made and remained true when Plaintiffs first arrived in KC after their transfer.  Plaintiffs argue FedEx construes their fraud claims too narrowly, and assert their fraud claims are predicated on FedEx's omissions of material facts necessary to their decision to transfer to another service center:  there was a change of operations scheduled for the Fresno service center which would result in Fresno drivers transferring involuntarily to KC, thus maintaining their seniority after Plaintiffs voluntarily transferred to KC.

Plaintiffs allege they spoke with human resources, and Flores and Taylor spoke with Sell prior to their transfers; each was given confirmation of their anticipated seniority when they transferred to KC.  Plaintiff Taylor alleges he was told he would be approximately 5th or 6th in seniority on a list of 15 new overall drivers (Doc. 33-7, ¶ 6); Plaintiff Arp was told he would be the 17th or 18th most senior driver out of approximately 60 drivers who would be eventually added (Doc. 33-6, ¶ 3); Plaintiff Flores alleges he was told he would be approximately the 11th most senior driver out of approximately 19 to 20 drivers (Doc. 33-3, Flores Decl., ¶ 6).  Plaintiffs allege that when they were told they would "receive seniority when biding on runs if they transferred to Kettlemen City," FedEx management knew Plaintiffs would never have the promised seniority.  (Doc. 1-2, ¶ 42.)

As FedEx notes, however, each Plaintiff conceded in his deposition that what was promised was essentially true upon their transfer to KC.  Specifically, Plaintiff Taylor admitted in

his deposition that when he transferred to KC in July 2012, he was given the run to Sacramento he

was allegedly promised, he was ranked in seniority exactly where Mr. Sell told him he would be,

and he was paid the rates stated in his offer letter:

> Q.  Before you transferred, did Mr. Sell ever tell you the run that you'd have?
> A [Plaintiff Taylor].  Yes.
> Q.  What did he tell you?
> A.  He told me I had one of the Sacramentos.
> Q.  Okay.  And when you transferred, did you, in fact, get one of the Sacramento runs?
> A.  Yes.
> Q.  Did he tell you specifically which Sacramento you'd get?
> A.  I don't think so.
> Q.  And when you got there was the seniority that you had accurate to what Mr. Sell had told you before you moved?
> A.  You want to rephrase that please?
> Q.  Sure.  Before you moved, you told me he gave you an idea where you'd fall. When you got there was that true?
> A.  Yes.
> . . .
> Q.  Okay.  We'll get to that in a second.  But everything he [Mr. Sell] told you turned out to be true?
> A.  Yes, Ma'am.
> Q.  Did he tell you how long you would have the Sacramento run?
> A.  No, I don't think so.
> Q.  Did he tell you how long you would stay at that seniority place . . . You know, you were like 5 or 6 out of the transferees, or you were 15 out of how many were there?
> A.  No.
> Q.  And he didn't tell you how long you would stay there?
> A.  No.

(Doc. 32-6, Exhibit E, Taylor Depo., 102:9-25; 103:7-9)

Similarly, Flores talked to Sell before agreeing to a transfer.  He alleges that Sell told him

there would be "good runs" available, but he admitted in his deposition that Sell did not promise

any particular run or any specific place on the seniority list.  Plaintiff Flores also spoke with a

manager at his service center and another supervisor in the Fresno service center.  Although Flores

maintains he was told he would get good runs and more money upon his transfer to KC, Flores

admitted that no one at FedEx ever lied to him:

> Q.  What did [Mr. Sell] tell you?
> A.  Well, he told me they have a good runs [sic], Sacramento, Cabazon meeting, Ludlow meet.

Q.  Ludlow?

A.  Yes.  And also he told me you're going to get one of those Cabazon runs in the transfer.

Q.  Did he promise you that you would get a Cabazon run?

A.  No.

Q.  Did he tell you why he though you would get Cabazon?

A.  Because I guess he got the list of the drivers transferring, so he figured out what number I am going to be in Kettleman.

A.  Okay.  Did he tell you anything else?

Q.  No that's about it.

Q.  Did he tell you where you would be in the seniority list?

A.  No.

. . . .

Q.  Okay.  So Kirk Sell told you that you would get [a] good run – that there were good runs there, correct?

A.  Yes.

Q.  And did – Kirk Sell didn't tell you what number you would be in seniority, did he?

A.  No.

Q.   And Kirk Sell didn't tell you that other people would come in under you, correct?

A.  No.

Q.  And Kirk Sell didn't promise you any specific runs, right?

A.  No.

Q.  Did Kirk Sell promise you any specific seniority?

A.  No.

Q.  And then you called back and talked to someone else in Fresno?

A.  Yes.

. . .

Q.  Okay.  Did this gentleman tell you what your seniority would be?

A.  No.

Q.  Did he promise you any specific runs?

A.  No.

Q.  Did he promise you the Cabazon Run?

A.  No.

Q.  Did he tell you – did he promise to you that you – that other people would be brought in with lower seniority?

A.  No.

Q.  Okay.  Did you talk to anyone else at Kettleman?

A.  No.

. . .

Q.  Do you believe that somebody made false promises to you?

A.  No.

(Doc. 32-6, Exhibit A, Flores Depo., 39:5-23, 40:13-41:5, 41:19-42:7, 60:22-24.)

14

Before transferring to KC, Plaintiff Arp spoke with Ms. Stonecipher, a FedEx terminal manager in Medford, Oregon, where Plaintiff Arp was working at the time:

> Q.  So did you talk to Irene [Stonecipher] about it?
> A.  Not until about a week before we left [for KC].
> Q.  And what did she say?
> A.  I came in that morning and said good morning to her and I asked her if she knew what my place would be there in Kettlman City.  And she picked up a piece of paper and read off what position I would be in by my company seniority, which was about number 17 or 18.
> Q.  Is that what you were?
> A.  When I went down to Kettleman?
> Q.  Yes.
> A.  I can't remember.  I think I was a little bit below that; maybe I was 19, 19 or 20, I'm not sure.
> . . . .
> Q.  Did she say how long you would have that level of seniority?
> A.  No.
> Q.  Did she make any promises to you about your seniority?
> A.  No.

(Doc. 32-6, Exhibit D, Arp Depo., 95:22-96:21.)

To the extent Plaintiffs' fraud claims are predicated on *affirmative* misrepresentations about promised seniority and the availability of "good runs," the claims are not viable.  Plaintiffs have conceded the seniority level and the availability of "good runs" allegedly promised to them were true when they transferred to KC.  They also admit that "everything was as stated" when they arrived in KC.  (*See* Doc. 34-2, DUMF 70, 87, 99.)  "It is fundamental that in order to state a cause of action for fraud, there must be (1) a *false* representation . . . ."  *Kerr v. Rose*, 216 Cal. App. 3d 1551, 1564 (1990); *see also Stansfield v. Starkey*, 220 Cal. App. 3d 59, 74 (1990) (affirming dismissal of fraud claim where it "was not clearly alleged that each representation was false *when made*").  Because the alleged promises about the KC transfer were admittedly true when made and at the time of the transfer, Plaintiffs cannot establish an essential element of their fraud claims, and FedEx is entitled to judgment as matter of law.  *Celotex Corp.*, 477 U.S. at 323 (plaintiff's failure to make a sufficient showing on an essential element of his case entitles defendant to a judgment as a matter of law).

**b.      The Alleged Misrepresentations Are Too Vague to support a Claim**

FedEx also argues the alleged misrepresentations asserted by Plaintiffs are simply too vague to support a fraud claim.  The Court agrees.

As explained by the California Supreme Court in *Scott v. PG&E*, "courts will not enforce vague promise about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise."  11 Cal. 4th 454, 472 (1995), *disapproved on other grounds by Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 352 n.17. Plaintiffs' allegations that they were promised "good runs" and that they would "receive seniority" upon transfer to KC are simply too nebulous and vague to be enforced.  While Plaintiffs contend in their opposition brief that there is a general consensus among drivers that longer runs are better than shorter runs, and daytime runs are better than nighttime runs, each Plaintiff conceded during his deposition that what makes a "good run" is different for every driver.  (Doc. 32-4, DUMF 10.) Also, while there is no dispute that Sell told Taylor and other drivers that they would be getting in "on the ground floor" of the KC service center upon transfer (*see* Doc. 34-2, DUMF 67), the term "ground floor" is too vague and lacks meaning and definition rendering it unenforceable.  *Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201, 216 (1993) ("Promises too vague to be enforced will not support a fraud claim any more than they will one in contract.").  In sum, even assuming the falseness of FedEx's alleged representations to Plaintiffs about their transfer to KC, the promises are too vague to enforce.[7]

**2.      False Representation Based on Concealment of a Material Fact**

According to Plaintiffs, the crux of their fraud claims is not that the conditions of their transfers were untrue at the time they were promised or at the time of their transfer, but that FedEx withheld the information about the Fresno change of operations that was going to affect the KC service center following Plaintiffs' transfers.  Thus, although FedEx's promises about the transfer to KC were generally true when Plaintiffs arrived in KC, FedEx knew the promised seniority and

---

[7] Because there is no material dispute over the truth of the statements Plaintiffs claim FedEx made to them about the details of their transfer to KC, and because any promises made about the transfer were too vague to enforce, the Court does not consider FedEx's alternative argument that any statements made by FedEx are privileged under California Civil Code § 47(c).

"good runs" would only be true until the Fresno change of operations occurred.  Plaintiffs' fraud claim is predicated on FedEx's *concealment* of the Fresno change of operations that would impact KC.

FedEx argues the concealment of future events is not actionable as fraud: Plaintiffs' theory is essentially that FedEx "should have predicted the future for them and that the failure to do so is fraud."  FedEx maintains that even if such a prediction were actionable, it would have been impossible to make such a prediction:  FedEx would not have known at the time of Plaintiffs' transfer who from Fresno might decide to involuntarily transfer when presented with the opportunity six months later.  (Doc. 34, 19:22-20:7.)

Withholding material information can constitute fraud through concealment or suppression, as the active concealment of facts by a nonfiduciary is the equivalent of a false representation.  *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 291 (2004).  Even where all affirmative statements are true, suppressing or failing to provide other material information that affects the statement is actionable as deceit.  *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 95 (2001) ("Not every fraud arises from affirmative misstatements of material fact.").  Pursuant to Section 1709 of the California Civil Code, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damages which he thereby suffers."  "A deceit, within the meaning of [Section 1709], is . . . suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ."  Cal. Civ. Code § 1710.  The elements of an action for fraud and deceit based on concealment include the following:  (1) a misrepresentation (through false representation, concealment, or nondisclosure); (2) the defendant was under a duty to disclose; (3) the defendant intentionally concealed with the intent to defraud (i.e., to induce reliance); (4) the plaintiff acted in justifiable reliance; and (5) there was resulting damage to the plaintiff.  *Lovejoy*, 92 Cal. App. 4th at 96.

As pled, Plaintiffs' fraud claim alleges false representations through affirmative statements, rather than false representations based on concealment of material information.  Nonetheless, Plaintiffs incorporated by reference the other allegations of the complaint into their fraud claim.

Read as a whole, the complaint alleges FedEx wrongfully concealed information about the Fresno change of operations from Plaintiffs when Plaintiffs sought details from FedEx management about their transfer to KC.   Specifically, Plaintiffs assert that while FedEx may have given them generally accurate information about their transfer – which turned out to be true at the time of their transfer to KC – FedEx withheld material information about the Fresno change of operations, knowing the change of operations would potentially result in involuntary transfers to KC that could affect Plaintiffs' seniority and the availability of "good runs" after Plaintiffs voluntarily transferred to KC.  (Doc. 1-2, ¶ 22.)

A fraudulent representation based on concealment requires there be a duty to provide the information withheld.

> [While] a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure, when one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated . . . One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

*Cicone v. URS Corp.*, 183 Cal. App. 3d 194, 201 (1986) (citations omitted).  Thus, when FedEx voluntarily supplied Plaintiffs with prospective information about the transfer to KC and the future of the KC service center, it was required to speak the whole truth.  When drivers inquired of Sell about the transfer to KC, he estimated where they would fall in terms of seniority, and for purposes of this motion, it is undisputed Sell told Taylor and other drivers they would be getting in on the "ground floor" of a growing service center based on projection of growth as KC changed from a relay center to a service center.  However, according to testimony from Michael Gahagan (Doc. 33-5, Gahagan Decl., ¶¶ 3-4), Sell knew and was telling other drivers in Fresno at that time that the Fresno change of operations would involve the involuntary transfers of drivers from Fresno to KC.  This information had the potential to impact Plaintiffs' seniority in the future, and it is disputed whether Sell shared this information with any non-Fresno drivers seeking information about a voluntary transfer in the summer of 2012.  (*See* Doc. 34-2, p. 39, Plaintiffs' Disputed

1 | Material Facts, No. 5.)[8]

2 | Finally, Plaintiffs' claim regarding concealment is not that FedEx should have predicted the

3 | future or that FedEx knew how many drivers and runs would transfer to KC as a result of the

4 | Fresno change of operations.  Rather, Plaintiffs allege they were entitled to the same information

5 | Sell was giving to the Fresno drivers he supervised regarding the Fresno change of operations so

6 | that Plaintiffs could weigh the risk of the transfer and the change of their job-class seniority in

7 | light of the pending change of operations.  Because there is evidence Sell volunteered some

8 | information about the KC service center and its future, he was under a duty to provide all the

9 | information he had about anticipated changes.  Plaintiffs alleged Sell had information relevant to

10 | their decision to transfer which he did not share with them, which in turn misled Plaintiffs about

11 | the potential risks to their seniority upon transfer to KC.  (Doc. 1-2, ¶¶ 19-22.)  Thus, Plaintiffs

12 | adequately alleged a false representation by concealment, and they have presented sufficient

13 | evidence to create a material issue of fact on the first (false representation) and second (duty)

14 | elements of their fraud claim.

15 | **3.      Disputed Issues of Fact Regarding Intentionality of Conduct**

16 | FedEx contends Plaintiffs have no evidence sufficient to prove the third element of their

17 | fraud claim: intent.   Fraud requires "active misconduct, such as intent to deceive, or

18 | misrepresentation, by the defendant." *Tyler v. Children's Home Society*, 29 Cal. App. 4th 511, 548

19 | (1994).   Often, fraudulent intent must be inferred from underlying circumstances as direct

20 | evidence is rarely available.  *Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal.

21 | App. 3d 388, 412 (1989), *as modified on January 5, 1990*.

22 | FedEx maintains Plaintiffs have no evidence that FedEx acted with the requisite intent to

23 | deceive at the time information was given to Plaintiffs regarding a voluntary transfer to KC.

24 | FedEx had the right to change Plaintiffs' employment status when circumstances of the business

25 | changed.  Plaintiffs were at-will employees, and regardless of the FedEx location to which they

26 | were transferred, their seniority and continued employment were not guaranteed for perpetuity.

27 |

28 | [8] Although the complaint does not expressly identify Plaintiffs' fraud claim as based on concealment, every element of a claim for fraud based on concealment is specifically pled in the complaint when construed as a whole.

FedEx notes that bids and runs change frequently and are not static. Seniority of drivers changes as service centers expand and add more drivers. According to FedEx, Plaintiffs knew what FedEx knew – that the KC service center was going to expand to upwards of 60 drivers in the future – and Plaintiffs offer no evidence that anything FedEx told them was intentionally false at the time Sell and other management made statements to Plaintiffs about a voluntary transfer to KC.

Plaintiffs' fraud claim encompasses false representations based on FedEx's suppression or concealment that the Fresno change of operations would result in the involuntary transfer of drivers from Fresno to KC. The question therefore is whether Plaintiffs have presented sufficient evidence that a reasonable jury could infer the requisite fraudulent intent on the part of FedEx in concealing or suppressing this fact.

It is undisputed that Sell managed the Fresno service center for 20 years, and in 2008 he became responsible for managing the KC relay yard. (Doc. 34-2, Plaintiffs' Statement of Disputed Material Facts, Nos. 1-2.) Before July 2012, approximately 12 to 14 line drivers worked in KC, but when FedEx implemented a change of operations along the I-40 corridor, it created a greater staffing need at KC. (Doc. 32-6, Exhibit G, Sell Depo., 26:18-27:5.) It is also undisputed that in the summer of 2012, Sell became responsible for staffing the KC relay yard with approximately 17 new drivers to accommodate the I-40 change of operations. (Doc. 34-2, Plaintiff's Statement of Disputed Material Facts, No. 3.) After publishing the KC openings internally to existing FedEx drivers, drivers began calling from various service centers seeking information about KC. (Doc. 32-6, Exhibit G, Sell Depo., 28:19-29:1.) Although FedEx initially sought 17 drivers to fill the positions in KC, only 12 drivers made the transfer; Sell testified "[a]s it turned out, 12 were all that were needed." (Doc. 32-6, Exhibit G, Sell Depo., 27:10-16.) During the first week of operation in KC after the I-40 change of operations, four to six drivers were "borrowed" from Los Angeles to work at KC as temporary transfers. (Doc. 32-6, Exhibit G, Sell Depo., 27:19-21.)

Sell testified he could not recall whether he specifically informed Plaintiffs about the Fresno change of operations (Doc. 33-8, Sell Depo., 42:2-9), but he also testified he would not have volunteered that information unless he had been asked:

1
2
3

> And yes, had I been asked, I would have been glad to share what little I knew about the upcoming change of operations, but for me to volunteer the information, yes, there were reasons that I wouldn't volunteer that information to them, because it would be speculative and it did not affect their seniority date.

4 (Doc. 32-6, Exhibit G, Sell Depo., 53:4-10.)

5     Despite not volunteering this "speculative" information to prospective KC drivers seeking

6 information about the transfer, there is evidence Sell informed Fresno drivers about the Fresno

7 change of operations; he counseled those drivers not to transfer to KC voluntarily in the summer

8 of 2012 but to wait instead until the change of operations so that they could transfer involuntarily

9 and retain their seniority.   According to Michael Gahagan, a former FedEx driver, from the first

10 day he began working for FedEx in Fresno in 2010 Gahagan was told that "the plan was for line-

11 haul drivers from Fresno to move to [KC]."  (Doc. 33-5, Gahagan Decl., ¶ 3.)   He was allegedly

12 approached by Sell in the summer of 2012 about transferring to a line-driver position in KC; Sell

13 informed him that most Fresno drivers would be transferring to KC in January 2013 so they could

14 keep their "job class seniority" by making the move under a change of operations.  (Doc. 33-5,

15 Gahagan Decl., ¶ 3.)  Because he was a "city driver" when Sell approached him, Gahagan would

16 restart his "job class seniority" whether he transferred voluntarily in July 2012 or involuntarily in

17 January 2013 under the Fresno change of operations.  (Doc. 33-5, Gahagan Decl., ¶ 3.)   Other

18 Fresno drivers were specifically told by Sell to wait until January 2013 to transfer under the

19 change of operations, rather than voluntarily transferring to KC, so they could keep their seniority.

20 (Doc. 33-5, Gahagan Decl., ¶ 4.)

21     Construing this evidence in the light most favorable to Plaintiffs, a trier of fact could

22 reasonably infer that Sell, who was responsible for staffing the KC relay center in the summer of

23 2012 under the I-40 change of operations, was struggling to find drivers to transfer voluntarily to

24 KC.  Sell testified he did not reveal information about the Fresno change of operations to drivers

25 looking to transfer voluntarily to KC in the summer of 2012 unless he was asked about it because

26 it was simply too speculative, but Gahagan's testimony indicates Sell was telling drivers in Fresno

27 to wait to transfer to KC until the change of operations in 2013 so as to transfer involuntarily and

28

maintain their seniority.  (Doc. 33-5, Gahagan Decl., ¶ 3-4.)[9]  This gives rise to a reasonable inference that Sell deliberately withheld information about the prospective Fresno change of operations from drivers inquiring about voluntary transfers to KC so as not to dissuade them from making the transfer during the summer of 2012.[10]  While there is no evidence Sell knew exactly how many runs or drivers would be transferring from Fresno to KC under the Fresno change of operations, any prospective change of operations that necessitated *involuntary* transfers to KC could have dis-incentivized drivers from voluntarily transferring to KC.  With advance knowledge of a prospective change of operations, drivers considering a voluntary transfer would have known their job-class seniority in KC could be subject to change in unforeseeable ways quite soon after their transfer.  Knowing about a prospective change of operations without further details, such as runs and the number of drivers transferring involuntarily, may have created enough risk to dissuade drivers from requesting a voluntary transfer to KC.  This is particularly true of those drivers who would be transferring long distances, moving their families, and gambling existing high job-class seniority at their current service center.

In sum, there is sufficient evidence from which a jury could infer that FedEx intentionally withheld information of the Fresno change of operations from Plaintiffs.

### 4.    Disputed Issues of Fact Regarding Detrimental Reliance

FedEx argues Plaintiffs' fraud claims fail as a matter of law because they remained employed even after learning of the alleged fraud, and thus they cannot establish the reliance element of their fraud claim.  To establish reliance, Plaintiffs must show (1) that they actually relied on FedEx's misrepresentations, and (2) that they were reasonable in doing so.  *OCM*

---

[9] FedEx objected to this portion of the Gahagan declaration on grounds of hearsay and relevance. (Doc. 34-3, No. 23-24.)  Sell's statements to Gahagan are offered by Plaintiffs against FedEx, an opposing party.  Sell is FedEx's employee, and Sell's statements to Gahagan pertained to a matter within the scope of Sell's relationship with FedEx. Sell's statements to Gahagan are not hearsay.  Fed. R. Evid. 801(d).  Moreover, the statements are relevant to establishing intentional concealment by Sell in that while Plaintiffs allege Sell told them nothing about the Fresno change of operations, Sell was telling the drivers he supervised in Fresno details about the Fresno change of operations.  FedEx's objection is OVERRULED.

[10] While Arp did not receive information directly from Sell about the position, Apr received information from Taylor who had contacted Sell and obtained information from him.  (*See* Doc. 33-6, Arp Decl., ¶ 3.)

1   *Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 863-64

2   (2007) (citing 5 Witken, Summary of Cal. Law, Torts, § 808, p. 1164-65, §812, p. 1173-74).

### a.   Actual Reliance

4   Reliance exists when the misrepresentation or nondisclosure was an immediate cause of

5   the plaintiff's conduct, which in turn, altered his or her legal relations, and without such

6   misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered

7   into the contract or other transaction. *Spinks v. Clark*, 147 Cal. 439, 444 (1905).

8   FedEx cites *Rochlis* for the proposition that if a plaintiff continues his or her employment

9   after discovering alleged fraud related to that employment, actual reliance cannot be established.

10   19 Cal. App. 4th at 215.  FedEx argues it is undisputed that Plaintiffs became aware of the alleged

11   falsity of FedEx's misrepresentations shortly after arriving in KC, yet they remained employed for

12   several months before taking any action.  Thus, FedEx argues Plaintiffs cannot establish actual

13   reliance.

14   In *Rochlis*, plaintiff Jeffrey Rochlis ("Rochlis") began working for Walt Disney Company

15   ("Disney") in February 1985, and in April of that year he signed a three-year employment

16   contract.  *Id.* at 207.  At some time before October 1987, Rochlis became unhappy about his

17   position and indicated he would probably leave Disney when his contract expired in April 1988.

18   *Id.*  To address his dissatisfaction, Disney offered him a different position within another division,

19   Walt Disney Imagineering ("WDI"), which Rochlis accepted in October 1987.  *Id.*  By January

20   1988, however, Rochlis determined the new position had been misrepresented to him by Disney,

21   and stated his "understanding [about the position] was considerably different than what [he] was

22   led to believe [he] was going to be doing when [he] got there."  *Id.* at 208.  Despite the alleged

23   misrepresentations, he remained in the WDI position until January 1989, well after his contract

24   had expired in April 1988.  *Id.*  He never sought another position within WDI, and he engaged in

25   negotiations for a bonus and a salary increase.  *Id.*  His dissatisfaction with his job and the amount

26   of his compensation led him to resign in January 1989.  *Id.* at 209.  He negotiated a new job with a

27   company known as King World which was significantly more lucrative than his position at

28   Disney/WDI.  *Id.*  He resigned from King World after seven months, claiming he had been

1   constructively discharged.  *Id.*  He settled his dispute with King World, and filed suit against

2   Disney and WDI in October 1990 alleging breach of contract and fraud, among other claims.

3   Disney and WDI filed a motion for summary judgment, which was granted by the trial court.  *Id.*

4   at 209.   Rochlis appealed, but the trial court's order on summary judgment was affirmed.  *Id.* at

5   219.

6        As it pertained to Rochlis' fraud claim regarding the alleged misrepresentations about the

7   WDI position to which he transferred in 1987, the appellate court was unconvinced Rochlis could

8   show any actual reliance.  *Id.* at 215-16.  The court noted Rochlis was under contract only until

9   April 1988.   *Id.*   He began work in his new position in October 1987 based on what he

10  characterized as fraudulent misrepresentations concerning WDI's condition and the status of its

11  pending projects.   *Id.*   Before the expiration of his contract, however, Rochlis admittedly

12  discovered the "truth" about the nature of his job and had become familiar with all WDI's

13  problems he was being asked to solve.  *Id.*  Yet, in spite of this knowledge, Rochlis stayed on for 9

14  months beyond the April 1988 expiration of his contract.   *Id.*   During this time, he continued to

15  seek and obtained a substantial bonus and a salary increase.  *Id.*  Moreover, Rochlis had stated

16  before he took his position at WDI that he was not interested in renewing his contract past April

17  1988.  The court determined that, as a matter of law, because he was aware of all the problems he

18  claimed were not previously disclosed to him, yet nonetheless decided to remain at WDI, he did

19  not detrimentally rely on any misrepresentations about the job in transferring to his position with

20  WDI.  *Id.* at 216.

21       FedEx's citation to *Rochlis* is unpersuasive as the facts of that case are distinguishable.

22  Rochlis enjoyed significant ability to negotiate his pay, bonus structure, and his position within

23  Disney and WDI.  His transfer to another division of the company did not negatively affect his pay

24  or the financial conditions of his employment.   The nature of Rochlis' work industry and his

25  executive position enabled him to move laterally into a new position and eventually into a new job

26  in a way Plaintiffs here could not.  That Rochlis stayed in the "misrepresented" position after

27  discovering the "truth," despite his demonstrated and significant bargaining power as well as his

28  ability to find even more lucrative employment, established he did not rely on the alleged

misrepresentations about the nature of his position.   Had Rochlis *actually* relied on the representations about the position at WDI in transferring to that division, he would certainly have left the position when his contract expired in April 1988.   Unlike Rochlis, Plaintiffs were not upper management executive employees at FedEx – they did not enjoy the same bargaining power to negotiate the terms of their employment.  Also, unlike *Rochlis*, Plaintiffs' pay and benefits were closely tied to their seniority.  Plaintiffs' ability to find a similar position with the same pay and benefits upon leaving their employment with FedEx was limited in ways that Rochlis' ability to obtain similar work with the same or better pay and benefits was not.  Plaintiffs did not enjoy the ability to transfer to another service center voluntarily without again resetting their job class seniority, and they could not quit their employment without losing their company seniority.   The mere fact that Plaintiffs continued their employment with FedEx after discovering the alleged fraud does not, as a matter of law, show a lack of actual reliance.  The reasoning of *Rochlis* simply does not apply to Plaintiffs under the circumstances presented here.  Thus, Plaintiffs' decision to remain with FedEx even after discovering the "truth" regarding the Fresno change of operations does not negate actual reliance as a matter of law.

### b.      Reasonable Reliance

In addition to actual reliance, "[a] plaintiff must also establish "justifiable" reliance – i.e., the circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation."  *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal. App. 3d 1324, 1332 (1986).  The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience.  *OCM Principal Opportunities Fund*, 157 Cal. App. 4th at 864.  "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."  *Blankenheim v. E.F. Hutton & Co., Inc.*, 217 Cal. App. 3d 1463, 1475 (1990). "However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts."  *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (1991).

FedEx argues any reliance by Plaintiffs was not reasonable as a matter of law.  According to FedEx, any promises made to Plaintiff about their seniority upon transfer to KC or the availability of "good runs" that directly conflicted with their offer letters before transfer would be unquestionably unreasonable.  It is undisputed that each Plaintiff received an offer letter outlining that the transfer was employee requested, that the job-class seniority of the driver would change to the date of the transfer, and the company seniority would remain unchanged.  (Doc. 34-2, DUMF, No. 39.)

FedEx's argument in this regard is predicated only on alleged affirmative misrepresentations, rather than on FedEx's alleged concealment of material information about the Fresno change of operations.  According to Plaintiffs, Sell and other management estimated each Plaintiff's expected seniority if they transferred voluntarily to KC, and also gave them general information about the expected expansion of the KC service center.  (Doc. 33-3, Flores Decl., 5-6; Doc. 33-6, Arp Decl., ¶¶ 3-4; Doc. 33-7, Taylor Decl., ¶¶ 6-7.)  There is also evidence Sell was giving Fresno drivers information about the Fresno change of operations and was counseling them *not* to transfer voluntarily in the summer of 2012, but to wait until the change of operations would transfer them involuntarily.  Gahagan's testimony suggests that Sell knew the Fresno change of operations was important and material to any driver's decision to voluntarily transfer to KC because of how it might impact job-class seniority both for those transferring to KC and those already working in KC.  (Doc. 33-5, Gahagan Decl., ¶¶ 3-4.)

Because there is evidence that Sell and FedEx management provided Plaintiffs with some prospective information about KC and its future growth and the type of seniority Plaintiffs could anticipate if they transferred, there is an issue of fact whether it was reasonable for Plaintiffs to expect they would receive all information material to a transfer to KC involving job-class seniority.  This is particularly true as information about changes of operations was being shared with other drivers who were considering transfers to KC, i.e., the Fresno drivers.  The reasonableness of Plaintiffs' reliance on FedEx to provide them *all* the information relevant to Plaintiffs' job-class seniority and their decision to transfer cannot be determined as a matter of law.

**5.     No Genuine Dispute Regarding Damages**

FedEx submits payroll data and argues this evidence establishes Plaintiffs cannot prove any damages, and thus their fraud claims must fail.

"[R]ecovery in a tort action for fraud is limited to the *actual damages* suffered by the plaintiff." *Ward v. Taggart*, 51 Cal. 2d 736, 741 (1959).  "'Actual' is defined as 'existing in fact or reality,' as contrasted with 'potential' or hypothetical,' and as distinguished from 'apparent' or 'nominal.' [citation omitted]  It follows that 'actual damages' are those which compensate someone for the harm from which he or she has been proven to currently suffer or from which the evidence shows he or she is certain to suffer in the future." *Saunders v. Taylor*, 42 Cal. App. 4th 1538, 1543 (1996).  "'[T]he mere probability that a certain event would have happened upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages.'"  *Marshak v. Ballesteros*, 72 Cal. App. 4th 1514, 1518 (1999) (quoting *McGregor v. Wright*, 117 Cal. App. 186, 197 (1931)).  Further, unless the plaintiff merely seeks to rescind a contract, he or she must suffer "actual monetary loss to recover on a fraud claim." *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1108 (1988).

**a.     No Genuine Dispute Regarding Arp's Damages**

FedEx bears the initial burden of showing that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323.  As FedEx does not bear the ultimate burden of persuasion at trial, it can show an absence of a material issue in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case; or (2) showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos. Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

Based on the payroll records submitted by FedEx, Arp earned more money after his transfer to KC than he had earned before his transfer.  FedEx cites Arp's testimony that after he transferred to KC he earned up to $1,700 per week, compared to the $900 to $1,200 per week he earned in Medford prior to the transfer.  (Doc. 32-6, Exhibit D, Arp Depo., 51:7-21; 107:12-108:15; 156:4-10.)  Further, FedEx payroll data shows Arp earned an average of $1,188 per week pre-transfer and $1,588 after the transfer.  (Doc. 32-4, Johnson Decl., Exhibits A and B.)  These

1    facts are undisputed by Plaintiffs.  (Doc. 34-2, DUMF 88.)  Thus, Arp cannot establish that he was

2    damaged as a result of the transfer to KC.

3         While Arp claims he was forced to resign as a result of FedEx's concealment of the Fresno

4    change of operations and now makes roughly half of what he made before the transfer, this is

5    insufficient to establish any damage resulting from the Fresno change of operations.  It is

6    undisputed that Arp separated from his employment with FedEx in November 2012 *before* the

7    Fresno drivers transferred to KC – which is the event Plaintiffs claim caused their damages.  (*See*

8    Doc. 34-2, DUMF 89.)   Therefore, any damage Arp may have suffered as a result of his

9    resignation is not causally linked to the transfer of Fresno drivers to KC.  Even assuming Arp quit

10   his job because of the prospective Fresno change of operations, his damage (losing his assigned

11   run) was only anticipated and had not actually occurred at the time of his separation from

12   employment with FedEx.  *Marshak*, 72 Cal. App. 4th at 1518.  Plaintiff Arp has presented no

13   evidence disputing FedEx's payroll data, and he cannot causally link any damage suffered as a

14   result of the transfer of the Fresno drivers to KC.

15         **b.     No Genuine Dispute Regarding Damages of Plaintiffs Flores and Taylor**

16        FedEx submits payroll data to establish that Plaintiffs Flores and Taylor also suffered no

17   damages as a result of the Fresno drivers transferring to KC.  FedEx offers evidence of each

18   Plaintiff's weekly average income in the year before and the year after they transferred to KC.

19   (Doc. 32-4, Johnson Decl., Exhibit A.)  The weekly pay data shows that for the 27 weeks between

20   January 6, 2012, and July 6, 2012 (the six months immediately *prior* to Plaintiffs' transfers to KC)

21   Plaintiff Taylor earned a total of $44,030.19 or an average of $1,630.75 per week.  (*Id.*)  The pay

22   data for the 27 weeks between January 4, 2013, and July 5, 2013 (the six months immediately

23   *after* the Fresno drivers' transfer to KC when Plaintiffs allege they were damaged) shows Plaintiff

24   Taylor earned $46,052.29 or an average of $1,705.64 per week.  (*Id.*)  The pay data for Plaintiff

25   Flores is similar:  between January 6, 2012, and July 6, 2012 (prior to the transfer to KC) he

26   earned $44,092.49 or an average of $1,633.06 per week; between January 4, 2013, and July 5,

27   2013, (immediately after the Fresno drivers transferred from KC) he earned $46,455.81 or an

28   average of $1,720.59 per week.  (*Id.*) This data is sufficient to establish Plaintiffs Flores and

1   Taylor were not monetarily damaged by the Fresno drivers transfer to KC.  The burden thus shifts

2   to Plaintiffs to produce evidence of a genuine dispute of material fact regarding damages.

3        In opposition, Plaintiffs cite their declarations stating that, while they earned about the

4   same amount of income before and after the transfer to KC, they did so by increasing the number

5   of days they worked and picking up extra shifts working on non-driving tasks such as loading on

6   the docks.    Plaintiff Flores states that when the Fresno drivers transferred in January 2013, his

7   work schedule

> went from five (5) days a week to six (6) to make up for the money I was losing on
> the runs.  Being on the extra board meant that I could not anticipate or predict
> when, or if, I was going to get a run on any given day.  Prior to January 2013, I had
> a consistent daily run on Mondays through Fridays.  After January 2013, I was on
> call and did not know if I would get a run, and, if so, how long it would be or how
> much I would earn.  In order to make up for the lost income, I began picking up
> weekend runs and working as a hostler or on the docks for FedEx freight on the
> weekends.  This meant that I was on call six (6) days per week.  While I was able to
> maintain my same income, I had to do so by working every Saturday on the docks.
> This was personally exhausting and took a toll on my family life as well.

(Doc. 33-3, Flores Decl., ¶ 15.)  Plaintiff Taylor stated the following in his declaration:

> 18.    Following the transfer of drivers from Fresno in January 2013, my work and
> personal life changed drastically.  Being on the "extra board" meant that I could not
> anticipate or predict when, or if, I was going to get a run on any given day.  Prior to
> January 2013, I had a consistent daily run to Sacramento on Mondays through
> Fridays.  After January 2013, I was on call and did not know if I would get a run,
> and, if so, how long it would be or how much I would earn.  In order to make up for
> the lost income, I began picking up weekend runs and working as a hostler for
> FedEx Freight, Inc. on the weekends.  This meant that I was on call pretty much
> seven (7) days a week.  As shown in Exhibit "A" to Jack Johnson's declaration, in
> the first half of 2012, when I was still in Medford, I was making approximately
> $1,650-$1,700 every week working a regular Monday through Friday schedule.  In
> the first half of 2013, while working in Kettleman City, my income ranged from
> $1,400 to more than $2,000 per week, depending on the runs I received off the
> "extra board[,]" and the amount of weekend work I was able to pick up.  In short, I
> made roughly the same amount of money in Kettleman City, but I had to work the
> weekends as a hostler in order to do so.  I am sixty (60) years old and have
> diabetes, the extra work in the yard hooking trailers and working weekends took a
> serious physical toll on my body and my personal life.
>
> 19.  My wife and family live in Sacramento and I generally went home on the
> weekends to spend time with them.  When the Fresno drivers transferred to
> Kettlemen City, I could rarely go home because I now had to work, or at least be on
> call, during the weekends to make the same money I was making in Medford.  The

1    extra money I earned working the weekends for [FedEx] was essentially the
     equivalent of picking up a part-time job to make ends meet.

2  (Doc. 33-7, Taylor Decl., ¶¶ 18-19.)

3        Taylor's and Flores' declarations standing alone do not constitute evidence necessary to

4  dispute the payroll data produced by FedEx.  Even if Plaintiffs were forced to work additional

5  days to make up for the loss of their assigned runs after the transfer of Fresno drivers to KC, no

6  data shows they actually earned less money as a result.  Plaintiffs offer no evidence that they were

7  required to work *more* hours, and they attest only that they worked more days during the week.

8  Even to the extent Plaintiffs could offer evidence they worked more hours to make up for a loss of

9  income as a result of the transfer of Fresno drivers, this is not evidence of actual monetary loss.

10 While working extra shifts or more days may have reduced Taylor's and Flores' time with their

11 families, and that time is certainly of personal value, it is *not* evidence of actual monetary loss,

12 which is required under California law.  *See Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226,

13 1240 (1995) (actual monetary loss is required to recover on a fraud claim).  Further, Plaintiffs cite

14 no case authority for the proposition that successful mitigation – picking up extra hours and shifts

15 – does not offset damages suffered; there is also no evidence of the monetary value of the

16 mitigation efforts Taylor and Flores claim they undertook.  In sum, Taylor and Flores offer

17 insufficient evidence to dispute FedEx's payroll records showing they earned more money after the

18 January 2013 transfer of Fresno drivers to KC (the event Plaintiffs claim damaged them) than they

19 had earned in the comparable months before they transferred to KC.

20       Plaintiff Flores notes FedEx's payroll records show that in the 12 months before his

21 transfer to KC he earned $90,581.2; in the 12 months after his transfer to KC, he earned only

22 $89,091.45.  (Doc. 33, 15:14-23.)  Plaintiff Flores fails to note, however, that the 12-month payroll

23 data before his transfer to KC contains 52 pay periods, while the payroll data for 12-month period

24 after his transfer contains only 51 pay periods.   (*See* Doc. 32-4, Johnson Decl., Exhibit A, p. 7-

25 9.)[11]  There is no meaningful comparison between 52 weeks of pay in 2011 and 2012 and 51

26

27 _____
   [11] The data for 2011 to 2012 extends from July 22, 2011, to July 13, 2012, which included 52 pay weeks.  The data for
28 2012 to 2013 extends from July 20, 2012, to July 5, 2013, which includes 51 weeks of work.

weeks of pay between July 2012 and July 2013.  This only shows that Flores earned less in 51 weeks than he did in 52 weeks.

Finally, Plaintiff Flores contends he suffered damage in relocating his family and incurred moving expenses, but he offers no evidence of the amount of those damages.  (Doc. 33, 15:23-25.) His conclusory statement that he suffered these damages is insufficient to create a genuine dispute as to whether Flores suffered actual monetary loss.[12]  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808-09 (9th Cir. 1988) (summary judgment upheld where nonmoving party failed to provide any evidence regarding amount of damages).  Because Plaintiffs cannot establish their damage, which is an essential element of their fraud claims, FedEx is entitled to summary judgment on these claims.

**C.     FedEx is Entitled to Summary Judgment on Plaintiffs' Contract Claims**

FedEx argues Plaintiffs' admission that they are at-will employees precludes them from establishing any kind of contract, particularly one which promises some future event or relies on policies that can be modified at any time.  FedEx also contends the promises FedEx allegedly made are too conclusory and vague to be enforceable.  Even assuming there was an enforceable agreement, there is no evidence of a breach as Plaintiffs concede they received all they were promised when they transferred to KC.  Finally, FedEx payroll evidence proves they suffered no damage as a result of their transfer to KC.

Plaintiffs contend FedEx has long-established rules as to seniority, transfer, and the selection of runs in its employee handbook.  FedEx breached these oral promises and implied-in-fact agreements when it transferred drivers from Fresno with fewer runs than drivers.  Plaintiff Taylor states in his declaration that the KC change of operations failed to comport with FedEx policy:

> The written policies state that when transferring, a line-haul driver can keep his/her seniority when they "follow the work[.]" [citation omitted] When FedEx planned the "change-of-operations[,"] they transferred approximately thirty-three (33) drivers from Fresno, but they only brought approximately twenty-five (25) runs; yet, all the drivers transferring from Fresno kept their seniority and moved ahead of me [on] the seniority board.  Before the "change-of-operations[,] every driver in

---

[12] Flores' statement regarding his relocation expenses is not contained in his declaration.  (*See* Doc. 33-3, Flores Decl.)

1
2
3
4
5

> Kettleman City, including me, had a run.  Now there were more drivers than runs and a number of drivers, including me, were on the "extra board."  Before the "change-of-operations[,"] there was no "extra board" in Kettleman City.   In summary, eight (8) of the drivers transferring from Fresno were not "following the work" and did not bring a run with them when they transferred.   Under FedEx policy, they should not have been permitted to keep their seniority and they should have been below me in terms of seniority.  If company policy had been followed, I would have had a run.

6

(Doc. 33-7, Taylor Decl., ¶ 16.)  Plaintiffs contend there is a question of fact whether FedEx

7

policies, oral and written, establish a contract and whether FedEx violated that contract.

8

9

      **a.**      **New Theory of Contract Breach Based on FedEx's Failure to Adhere to Its Policies and Procedures Does Not Create Genuine Issue of Material Fact**

10

11

Plaintiffs' complaint alleges a breach of oral contract based on FedEx's promises to

12

Plaintiffs that if they transferred to KC, they would receive specified seniority that would entitle

13

them to bidding rights on preferred runs.  (Doc. 1-2, ¶ 57.)  Plaintiffs also allege a claim for breach

14

of an implied-in-fact contract predicated on the following terms:  (1) preferred line-haul runs

15

would be distributed pursuant to a bidding process; (2) the bidding process would be based on

16

seniority; (3) junior drivers would not be permitted to arbitrarily jump ahead of senior drivers in

17

the bidding process; (4) Plaintiffs would be kept informed of any changes in the bidding process;

18

(5) if Plaintiffs chose to transfer, they would be fully and accurately informed of how that would

19

affect their seniority; and (6) defendants would provide Plaintiffs with the necessary and accurate

20

information and support so that Plaintiffs could properly make decision such as whether or not to

21

transfer.  (Doc. 1-2, ¶ 62.)

22

Plaintiffs' opposition presents a new theory of breach of contract which was not pled:

23

FedEx's alleged failure to comply with policies and procedures related to changes of operations

24

and involuntary transfers.   Specifically, Plaintiffs contend FedEx breached its policies and

25

procedures by allowing Fresno drivers to involuntary transfer to KC and retain their seniority,

26

notwithstanding that 8 drivers did not "follow the work."   New theories of recovery of which a

27

defendant has not been put on notice may not be used to create genuine issues of material fact and

28

defeat a summary judgment motion. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir.

1  2000) (only where defendants have been on notice may a plaintiff proceed on an un-pled theory at

2  the summary judgment stage).  To the extent Plaintiffs now claim their breach of contract claims

3  are predicated on FedEx's policies and procedures related to involuntary transfers, it cannot be

4  used to defeat the motion for summary judgment because it was not pled in the complaint, and

5  Plaintiffs did not seek to amend the complaint to allege this contract theory.

6              **b.    Alleged Promises Made to Plaintiffs Are Unenforceable**

7         Plaintiffs failed to address FedEx's arguments regarding Plaintiffs' contract claims.  FedEx

8  argues the terms of the alleged contracts are not clearly alleged by Plaintiffs in their complaint and

9  to the extent Plaintiffs allege they were promised they would have good runs and seniority, these

10 promises are too vague to be enforceable.

11        Basic contract law requires that "[a]n offer must be sufficiently definite, or must call for

12 such definite terms in the acceptance that the performance promised is reasonably certain."

13 *Landas v. Cal. State Auto Ass'n*, 19 Cal. App. 4th 761, 770 (1993) (quoting 1 Witkin, Summary of

14 Cal. Law (9th ed. 1987) Contracts, § 145, p. 169).  "Where a contract is so uncertain and indefinite

15 that the intention of the parties in material particulars cannot be ascertained, the contract is void as

16 unenforceable."  *Cal. Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 481 (1955).  A

17 promise must be definite enough that a court can determine the scope of the duty.  *Robinson &*

18 *Wilson, Inc. v. Stone*, 35 Cal. App. 3d 396, 407 (1973).  Additionally, the limits of performance

19 must be defined so that damages can be determined on a rational basis.  *Id.*

20        Plaintiffs' opposition does not address FedEx's motion in this regard, and the bare

21 allegations of the complaint are insufficient to establish the terms of the alleged contracts between

22 FedEx and Plaintiff.  For example, Plaintiffs' claims of an implied-in-fact contract alleges one of

23 the terms of their employment with FedEx was that Plaintiffs be given "necessary" and "accurate"

24 information to enable them to make decisions such as whether to transfer to a new service center;

25 however, Plaintiffs cite no evidence establishing this as a term of an implied or oral contract.

26 *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (nonmoving party cannot rely on

27 conclusory allegations unsupported by factual data to create an issue of material fact).  Not only

28 do Plaintiffs fail to establish facts as to what personnel acts, policies, and communications

33

establish this alleged term of employment, what constitutes "necessary" information is not sufficiently definite to be enforceable.

Similarly, Plaintiffs' claim for breach of oral contract alleges they were promised that upon transfer to KC, they would be given "bidding rights on preferred runs," and these "preferred runs" would allow Plaintiffs to earn more money than they were earning at their present locations. (Doc. 1-2, ¶ 57.)   What constitutes "preferred runs" and what is meant by "bidding rights" is too vague and is therefore unenforceable. *Ladas*, 19 Cal. App. 4th at 771 (amorphous promise to "consider" what employees at other companies are earning cannot rise to the level of a contractual duty).

### c.   Plaintiffs Fail to Establish Breach or Damages

FedEx also claims Plaintiffs failed to establish any breach of the alleged promises. As discussed above, Plaintiffs concede that everything was generally as it was promised when they arrived in KC after their transfer – thus, any breach based on affirmative promises regarding Plaintiffs' transfer to KC cannot be established. (Doc. 34-2, DUMF 69, 85, 87, 99.)

Finally, Plaintiffs have failed to produce evidence sufficient to create an issue of material fact regarding damages. FedEx met its burden on summary judgment by producing payroll data showing Plaintiffs earned more money in the months and weeks following their transfer. Thus, even to the extent there was an enforceable contract, Plaintiffs have failed to show they were damaged by the transfer of the Fresno drivers to KC.

Plaintiffs produced insufficient evidence to dispute FedEx's payroll records and cannot establish the damage element of their contract claims. Thus, FedEx is entitled to summary judgment on Plaintiffs' contract claims.[13]

### D.   Plaintiffs' Conceded Claims

In their opposition, Plaintiffs state they "do not contest the dismissal of the constructive fraud claim (second cause of action) or the claim for breach of the implied covenant of good faith and fair dealing (fifth cause of action)." (Doc. 33, 11:15-17.)  Based on Plaintiffs' representation,

---

[13] Because the Court finds Plaintiffs' contract claims are insufficient on other grounds, it declines to reach FedEx's argument that Plaintiffs' at-will status negates the viability of any contract.

FedEx's motion for summary judgment is also granted as to Plaintiffs' claims for constructive

fraud and for breach of the implied covenant of good faith and fair dealing.

### V.    CONCLUSION AND ORDER

For the reasons set forth above, IT IS HEREBY ORDERED that:

1.    FedEx's motion for summary judgment is GRANTED;

2.    The Clerk of Court is DIRECTED to enter judgment for Defendant; and

3.    This case is to be administratively closed.


IT IS SO ORDERED.

Dated:   **February 10, 2015**                    **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE